Filed 9/30/20  P. v. Meeks CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E072894 |
| v. | (Super.Ct.No. 16CR013918) |
| JOVAN MEEKS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed in part; reversed in part with directions.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Paige B. Hazard and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jovan Meeks shot at an apartment where Kirk Savala was standing outside on the patio smoking a cigarette.  Several other persons were standing

1

near the apartment and Kirk's wife, Donna Savala, was inside the living room of the apartment. Kirk was shot and killed. Donna was shot but survived.

Defendant was found guilty in count 1 of voluntary manslaughter for the death of Kirk Savala (Pen. Code, § 192, subd. (a)).[1] Defendant was convicted in counts 2 (Donna Savala), 3 (Thomas Savala), 4 (Tyler Peace) and 5 (Eric Brewer)[2] of attempted voluntary manslaughter (§§ 664, 192, subd. (a)). The jury found true weapons use enhancements for counts 1, 2, 3, 4, and 5 within the meaning of section 12022.5, subd. (a)). The jury also found true the enhancement on count 2 that he personally inflicted great bodily injury on Donna. (§12022.7, subd. (a).) Defendant was also found guilty of shooting at an inhabited dwelling (§ 246) in count 6 and the jury found the special allegations true that he personally used a firearm and personally used a firearm causing great bodily injury (§ 12022.53, subds. (b) & (d).) Defendant was sentenced to a determinate term of 16 years four months, plus the indeterminate term of 25 years to life.

Defendant claims in his appellant's opening brief that (1) insufficient evidence was presented to support his conviction of attempted voluntary manslaughter of Donna because he had no intent to kill her; (2) his conviction of attempted voluntary manslaughter must be reversed because the jury was instructed with CALCRIM No. 562 on transferred intent, which the jury improperly applied to count 2; (3) prosecutorial misconduct requires reversal of count 2; (4) ineffective assistance of counsel requires

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Eric Brewer is referred to in the record by "Erik" and "Eric."

reversal of count 2; (5) cumulative errors require reversal of count 2; (6) the weapons use enhancement imposed and stayed pursuant to section 12022.53, subdivision (b), for his conviction of section 246 must be stricken; and (7) remand is necessary in order for the trial court to properly exercise its discretion to strike the section 12022.53, subdivision (d), enhancement. In a supplemental brief, defendant argues that his convictions of attempted voluntary manslaughter in counts 3, 4 and 5 must be reversed because the jury was improperly instructed with CALCRIM No. 562 on transferred intent, and based on the instructional error and the arguments by the prosecutor, it cannot be said that such erroneous instruction was harmless beyond a reasonable doubt.

## FACTUAL HISTORY

### A. PEOPLE'S CASE-IN-CHIEF

Donna Savala had been married to Kirk Savala for over 28 years. They had five children and 10 grandchildren. In April 2016, she and Kirk[3] lived in apartment No. 1 at the Parkview Apartments in San Bernardino. Their son Thomas Savala lived with them along with Donna's daughter and some of their grandchildren. They had lived at the apartment for three years and had good relationships with their neighbors. A stairwell next to their apartment led to the apartments above them. Juan Hernandez lived directly above them. Defendant lived in apartment No. 38.

---

[3] We refer to some witnesses by their first names for clarity due to shared last names and/or to preserve their anonymity (Cal. Rules of Court, rule 8.90(b)). No disrespect is intended.

On the morning of April 16, 2016, around 10:00 a.m., Donna was home with Kirk and Thomas. Her daughter and eight of her grandchildren were also in the apartment. Tyler Peace was friends with Thomas and lived around the corner. Peace and his cousin, Eric Brewer, came to their apartment door at around 10:00 a.m. looking for Thomas. Thomas went outside with them. Peace, Brewer, and Thomas stood by the stairwell next to apartment No. 1. Brewer was acting paranoid. Thomas moved down to the sidewalk in front of the stairs while Peace and Brewer stayed in front of the stairwell. They smoked marijuana.

After Thomas went outside, Donna sat down on the couch inside to watch television. Kirk went outside on the patio and did not close the sliding glass door. Kirk stood on the patio and smoked a cigarette.

Thomas observed defendant walk to his car, which was parked just to the right of apartment No. 1. Defendant said nothing to Thomas, Peace, and Brewer and they said nothing to defendant. Defendant walked to the driver's side of his car, pulled out a gun and started shooting at them. He shot toward the patio of apartment No. 1 and where Brewer and Peace were standing near apartment No. 1.

Thomas heard a "handful" of gunshots and then they stopped. After these first rounds of gunshots, he ran and ducked between two cars that were parked in front of apartment No. 1. Thomas heard Kirk say, " 'I'm hit.' " Brewer and Peace went toward the door to apartment No. 1 but Thomas's sister did not let them in. They came back out toward the stairs and Peace shot back at defendant several times. Defendant went to get in his car and Thomas came out from his hiding place. Thomas yelled to defendant "you

4

shot my dad." Defendant responded, " 'My bad.' " Defendant was still holding his gun and pointed it at the ground. Thomas responded, "You shot my fucking dad." Defendant sped off in his car. Thomas ran to his dad.

Donna was sitting on the couch when she heard gunshots. They were loud and sounded like they were right outside the apartment. Donna initially heard three to four shots. She stood up and put her hand on the sliding glass door. She observed Kirk fall to the ground. As he was falling, she felt something hit her on her breast.

There was a pause in the gunshots and then she heard three or four more gunshots. Donna went to the bathroom and lifted up her shirt. She had a hole in her chest that was bleeding. She bled onto the sink. Donna did not see defendant during or after the shooting.

Donna went back out to the patio; Kirk was lying on the ground face up. Thomas was kneeling down next to him. Kirk was shot in the torso and Thomas tried to stop the bleeding. Peace and Brewer ran away.

Hernandez lived above the Savala family. On April 16, he arrived home from work around 10:30 a.m. He observed Kirk on the patio of Kirk's apartment. Thomas was outside near the stairwell. Hernandez said hello to both of them. He then heard gunshots. Neither Thomas nor Kirk were shooting at anyone. Hernandez ran back to his car. He then ran to his apartment. He did not recall telling a police detective that he saw the shooter.

Donna and Kirk were transported by ambulance to the hospital. The bullet had entered Donna's breast and exited through the middle of her chest. She had some wound

5

treatment for a few weeks after she was shot but did not require surgery. She stayed in the hospital for a few days. Kirk died as a result of a gunshot wound to his abdomen, which severed a major artery.

The jury was shown surveillance video from the area of the shooting. Thomas could be seen standing on the sidewalk in a red shirt. Suddenly, he ducked down between two cars and then could be seen talking to someone. Defendant was not visible. A car was seen speeding away from the shooting. Peace, Brewer, and Kirk were not visible in the surveillance video. Thomas did not see a gun in Peace's hand until defendant shot at them. When Thomas was interviewed by police, he never stated that Peace had shot at defendant.

San Bernardino County Sheriff's Detective Adam Salsberry participated in the investigation of the shooting. Detective Salsberry spoke with Hernandez the morning of the shooting and Hernandez indicated he saw a man start shooting toward the patio where Kirk was standing and then drive off. The shooter was Black. The person shot three to four times toward the patio. He then turned and shot another five to six shots. Hernandez showed Detective Salsberry where the shooter lived.

Eight nine-millimeter caliber casings were found in the parking lot at the apartment complex. The fence on the patio had bullet holes. The sliding glass door to apartment No. 1 was shattered. There were bullet holes around the frame of the sliding glass door. There was a bullet hole above apartment No. 1. A total of five nine-millimeter bullets were found.

6

Based on the location of the nine-millimeter casings, it appeared that the shooter was moving during the shooting. The door to defendant's car was likely open when he was shooting. There was a bullet hole on his car.

In addition to the nine-millimeter casings and bullets, .45-caliber bullets were found. The location of the .45-caliber bullets was consistent with someone having fired from the patio area of apartment No. 1 to the location where the nine-millimeter casings were found. Defendant could not be located in apartment No. 38. He was not found until June in Las Vegas.

B.     DEFENSE

On the day of the shooting, Brewer came to Peace's house and appeared to be on drugs. He was acting crazy. They walked to the store. Peace had his .45-caliber handgun that he carried for protection. Brewer told Peace to give him the gun but Peace refused. They went to Thomas's apartment. As they were standing near Thomas's apartment, someone started shooting at them. He could not see the shooter but Peace shot back in the direction he believed the shots were being fired.

Peace was interviewed by San Bernardino County Sheriff's Detective Justin Long just after the shooting. Peace first stated that that he had not been in possession of a gun and never admitted that he had shot at defendant. Peace then told Detective Long that Brewer had the gun and Peace had to take it away from Brewer because Brewer was acting crazy. He did not admit that he shot back at defendant. Peace finally admitted that he was the person who shot back at defendant. Peace took Detective Long to the place

7

where he had dumped his gun and ammunition.  Peace was adamant he was not the first person to fire shots.

San Bernardino County Sheriff's Detective Jonathan Woods interviewed Thomas after the shooting.  Thomas had heard Brewer and Peace talking about a gun prior to the shooting but could not recall the conversation.  Thomas did recall Brewer telling Peace to give him the gun.  Thomas observed Peace shoot three times but only after the initial shots were fired.  Thomas also yelled at Brewer, " 'This is because of you.  This is all your fucking fault.' "

Defendant testified on his own behalf.  In April 2016, he was living in apartment No. 38 with his girlfriend and her children.  He was a member of the Five Time Crips gang.  On the morning of the shooting, he walked to his car in order to meet a friend to buy some marijuana and cough syrup.  As he was opening the door to his car, he heard "Give me the gun.  Give me the gun."  Defendant had been shot two times before and thought that his life may possibly be in danger.

Defendant observed three men by the stairwell near apartment No. 1.  Defendant then heard one gunshot.  He thought someone was trying to kill him.  After he heard the gunshot, he reached for his nine-millimeter gun that was in his waistband, which he carried for protection, and returned fire.  He believed he shot his gun three or four times.  More shots were fired in his direction.  He hid behind his car.  When the shooting stopped, he drove off.

Defendant claimed to have only shot his gun four times but could have shot more.  He was afraid for his life.  The shots were coming from the stairwell by apartment No. 1.

8

He remembered seeing Peace and Brewer by the stairwell. He thought that Brewer was shooting. He went to Las Vegas because he was scared.

When defendant was first interviewed in Las Vegas, he did not admit to firing a weapon. He later admitted he fired his weapon but only because he was fired upon first. Defendant claimed he was just shooting "blind fire" because he was panicked. He had no trouble with the Savala family prior to the shooting. Defendant denied that he was trying to kill anyone. He did not point his gun at anyone.

C.      REBUTTAL

San Bernardino County Sheriff's Detective Nicholas Clark interviewed defendant in Las Vegas. Defendant told him and another officer that he heard somewhere between two and 10 shots being fired at him. Defendant described the shooters as Mexican. Defendant initially denied shooting back. Defendant admitted later to shooting back at the area where the shots were coming from. Defendant told Detective Clark that he heard someone say "Give me the gun" as he was unlocking his car. Defendant stated the shooting must have been because they knew he was a gang member.

**DISCUSSION**

A.      ATTEMPTED VOLUNTARY MANSLAUGHTER CONVICTION—
        DONNA

Defendant contends in his appellant's opening brief that his conviction of attempted voluntary manslaughter of Donna must be reversed because defendant did not have the intent to kill her. The prosecutor presented to the jury the improper theories of guilt of conscious disregard for life and transferred intent, which do not support an

9

attempted voluntary manslaughter conviction. Further, the prosecutor did not pursue a kill zone theory in the trial court and it cannot be argued to support the conviction on appeal. Since the only valid theory of guilt was that defendant intended to kill Donna, and the evidence does not support such a finding, his conviction in count 2 must be reversed. The People have conceded that there is insufficient evidence to support that defendant had the intent to kill Donna.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

In order to be convicted of voluntary manslaughter, a defendant must have either an intent to kill or a conscious disregard for life. (*People v. Bryant* (2013) 56 Cal.4th 959, 970.) "[A] killer who, acting with conscious disregard for life and knowing that the conduct endangers the life of another, unintentionally but unlawfully kills in a sudden

10

quarrel or heat of passion is guilty of voluntary manslaughter." (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 710 (*Gutierrez*).)

"An *attempt* to commit a crime requires a specific intent to commit the crime." (*Gutierrez*, *supra*, 112 Cal.App.4th at p. 710.) "[A]ttempted voluntary manslaughter cannot be premised on the theory defendant acted with conscious disregard for life, because it would be based on the 'internally contradictory premise' that one can intend to commit a reckless killing." (*Ibid.*)

The theory of transferred intent also does not apply to attempt crimes. "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal.5th 591, 602.)

Here, it is undisputed that defendant could not see Donna was inside apartment No. 1 before he began shooting. The evidence established that defendant did not see Donna during the shooting. There was no evidence that defendant had any quarrel with Donna, or otherwise had any negative interaction with her prior to the shooting. There was nothing presented by the prosecutor to support that defendant had the intent to kill Donna.

As stated, theories of transferred intent and conscious disregard could not support the conviction. (*People v. Canizales*, *supra*, 7 Cal.5th at p. 602; *Gutierrez*, *supra*, 112 Cal.App.4th at p. 710.) Further, the prosecutor did not pursue a conviction based on the

11

kill zone theory to support that defendant had the intent to kill Donna. No substantial evidence supports defendant's conviction on count 2.

Since we have reversed the attempted voluntary manslaughter conviction in count 2 based on insufficiency of the evidence, we need not address defendant's additional contentions that instructional error, prosecutorial misconduct, cumulative error and ineffective assistance of counsel require reversal of the conviction.

B.      ATTEMPTED VOLUNTARY MANSLAUGHTER FOR COUNTS 3, 4 AND 5—THOMAS, PEACE AND BREWER

In his appellant's opening brief, defendant restricted his arguments of sufficiency of the evidence, instructional error, prosecutorial misconduct, ineffective assistance of counsel and cumulative error to count 2. In the respondent's brief, the People acknowledged that count 2 should be reversed but also raised concerns regarding the instructions as they applied to counts 3, 4 and 5, and did not object to supplemental briefing by defendant. In a supplemental brief, defendant has argued that his convictions of attempted voluntary manslaughter in counts 3, 4 and 5 must be reversed because the jury was improperly instructed with CALCRIM No. 562 on transferred intent, and based on the arguments by the prosecutor, it cannot be said that such erroneous instruction was harmless beyond a reasonable doubt. The People counter that the transferred intent instruction was proper for the voluntary manslaughter charged in count 1 for Kirk. However, CALCRIM Nos. 572 and 460 were erroneous because they allowed the jury to consider the theory of implied malice for the charges of attempted voluntary manslaughter on counts 3, 4 and 5. The People concede that count 3, the attempted

12

voluntary manslaughter of Thomas, should be reversed. The People argue that the jury could have found that defendant had the intent to kill Peace and Brewer, and that based on the review of the record, such instructional error was not prejudicial.

1. *ADDITIONAL FACTS*

The parties discussed the jury instructions off the record. In court, both parties agreed with the instructions and there were no objections on the record. The jury instructions were read to the jury but not reported.

CALCRIM No. 572 was given, which provided "The defendant is charged in Count 1 with Voluntary Manslaughter (as to Kirk John Savala) in violation of Penal Code section 192, subdivision (a). [¶] To prove that the defendant is guilty of Voluntary Manslaughter, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] 2. When the defendant acted, he unlawfully intended to kill someone; [¶] AND [¶] 3. He killed without lawful excuse or justification. [¶] OR the People must prove that: [¶] 1. The defendant intentionally committed an act that caused the death of another person; [¶] 2. The natural consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew the act was dangerous to human life; [¶] 4. He deliberately acted with conscious disregard for human life; [¶] AND [¶] 5. He killed without lawful excuse or justification. [¶] An act causes death if the death is the direct, natural and probable consequence of the act and the death would not have happened without the act. A *natural and probable* consequence is one that a reasonable person would know is likely

13

to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

CALCRIM No. 460 was given and it stated "The defendant is charged with Attempted Voluntary Manslaughter in violation of Penal Code sections 664/192, subdivision (a), in Count 2 (as to Donna Savala), Count 3 (as to Thomas Savala), Count 4 (as to Tyler Peace), and Count 5 (as to Erik Brewer). [¶] To prove that the defendant is guilty of Attempted Voluntary Manslaughter, the People must prove that: [¶] 1. The defendant took a direct but ineffective step toward committing the crime of Voluntary Manslaughter; [¶] AND [¶] 2. The defendant intended to commit Voluntary Manslaughter. [¶] A *direct step* requires more than merely planning or preparing to commit voluntary manslaughter or obtaining or arranging for something needed to commit Voluntary Manslaughter. A direct step is one that goes beyond planning and preparation or shows that a person is putting his plan into action. [¶] A direct step indicates a definite and unambiguous intent to commit Voluntary Manslaughter. It is a direct movement towards the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstances outside the plan had not interrupted the attempt. [¶] A person who attempts to commit Voluntary Manslaughter is guilty of Attempted Voluntary Manslaughter even if, after taking a direct step towards committing the crime, he abandoned further efforts to complete the crime or if his attempt failed or was interrupted by someone or something beyond his control. On the other hand, if a person freely and voluntarily abandons his plans before taking a direct step toward committing

14

voluntary manslaughter then that person is not guilty of Attempted Voluntary Manslaughter. [¶] To decide whether the defendant intended to commit Voluntary Manslaughter, please refer to the separate instruction I have given you on that crime." The jury was not instructed on the kill zone theory.

CALCRIM No. 562 was given which provided "If the defendant intended to kill one person, but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."

In the prosecutor's opening argument, he argued that defendant "sprayed" bullets toward the patio. The prosecutor first discussed the charge of voluntary manslaughter for Kirk and that it could be committed based on defendant having an intent to kill. The prosecutor advised the jurors "But this option isn't what we're talking about here. The People are not alleging to you that this is the option that occurred. Now, you can consider this option if you want. If you believe that this is what the defendant did, and that's why he's guilty of voluntary manslaughter, by all means, go for it . . . . [¶] But what we're really talking about here is Option 2." The prosecutor explained that the jury must first find that defendant committed an act that causes a person's death. Further, that act had to have natural and probable consequences that are dangerous to human life. The prosecutor stated that "spraying" bullets at an apartment complex could result in death. Defendant had to know the act was dangerous to life. The fourth element was whether defendant deliberately acted with conscious disregard for life. Spraying bullets at the apartment showed he did not care about the consequences to life. The issue for the jury was whether defendant had justification for the shooting.

15

The prosecutor also argued that the fact defendant did not have the intent to kill Kirk was not a defense. The prosecutor stated, "Because if you spray bullets with conscious disregard and that act causes somebody's death, it doesn't matter if you're trying to hit one guy and you hit another." He then argued, "Same thing goes, you know, you might be thinking, well, he didn't even know Kirk was there. He didn't even know Donna was there. It's not a defense ladies and gentlemen. You cannot spray bullets at an inhabited house and then say, 'Well, I didn't know that there was anyone inside; so, therefore, I'm not guilty.' It's not a defense."

The prosecutor then argued, "So he's charged in counts 2 through 5 with attempted voluntary manslaughter. Basically what I have to prove here is that he tried to do all of those five things for voluntary manslaughter, but fell short. So what I'm talking about here is that firing his gun toward Thomas and Tyler and Eric, but then not being killed, is an attempt. So he's spraying bullets with conscious disregard." It fell short because they did not die. The prosecutor argued for count 2, "So, again, it's not a defense that he didn't intend to shoot Donna. Because when he sprayed the bullets at the house, with conscious disregard, he was attempting to commit voluntary manslaughter." Defendant's only defense was self-defense.

The prosecutor concluded that the reason defendant started shooting was because he had a "heightened state of awareness" and panicked when he heard the word "gun." The prosecutor stated that defendant was not a "cold-blooded killer." His lifestyle caused him to act "rashly."

16

In response, defendant's counsel argued that defendant had testified that he had not intended to kill anyone. As such, the jury could only find him guilty under the theory that he shot with conscious disregard for life. Defense counsel argued that defendant was only defending himself.

    2.    *ANALYSIS*

    a.    <u>Improper Instructions</u>

" '[I]nstructions on the crime of attempt to commit murder, necessarily, when they define the underlying crime of murder, must be limited only to that kind of murder where a *specific* intent to kill or, in other words, *express* malice, is one of the elements.' " (*People v. Lee* (1987) 43 Cal.3d 666, 671.) "[O]nce a defendant intends to kill, any malice he may harbor is necessarily express malice. Implied malice . . . cannot coexist with a specific intent to kill. To instruct on implied malice in that setting, therefore, may confuse the jury by suggesting that they can convict without finding a specific intent to kill." (*People v. Visciotti* (1992) 2 Cal.4th 1, 58, fn. omitted.)

Here, the jury was instructed with CALCRIM No. 572 that they could convict defendant of voluntary manslaughter if they found he (1) had the intent to kill and the person in fact was killed, *or* (2) if he acted with conscious disregard for human life when he shot at apartment No. 1. This was proper for voluntary manslaughter as the jury could properly find defendant guilty based on implied malice. CALCRIM No. 460 informed the jury that they could find attempted voluntary manslaughter if they found that defendant took a direct but ineffective step toward committing voluntary manslaughter. The jury was advised to look to CALCRIM No. 572 for the definition of voluntary

17

manslaughter. As such, the jury was improperly informed that they could find attempted voluntary manslaughter by finding that defendant had conscious disregard for life when he shot at Thomas, Brewer and Peace. This was an incorrect theory as implied malice cannot support attempted voluntary manslaughter.

Defendant has also argued that the jury was improperly instructed with CALCRIM No. 562, which advised the jurors that they could find defendant guilty if defendant intended to kill one person, but by mistake or accident killed another—the crime would be the same as if he had the intent to kill the victim, e.g. transferred intent. This was not an improper instruction as it clearly applied to the shooting of Kirk only, as it specifically referred to a person who had been killed.

### b.      Prejudice

Recently, in *People v. Aledamat* (2019) 8 Cal.5th 1, the court considered the standard of prejudice when the jury is instructed on a proper legal theory but also instructed on an improper theory. It found that the "usual 'beyond a reasonable doubt' standard of review established in *Chapman v. California* (1967) 386 U.S. 18, 24 . . . for federal constitutional error applies. The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Id.* at pp. 3, 13.) It stated, "The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well." (*Id.* at p. 15.) In *Aledamat*, the court

18

considered the entirety of the instructions and the argument of counsel in assessing prejudice. (*Id.* at pp. 14-15.)

As for the instructions as a whole in this case, no other instructions limited implied malice only to the charge of voluntary manslaughter. The jury was instructed that they could consider implied malice to support attempted voluntary manslaughter. Although they were also instructed for voluntary manslaughter that they could find defendant guilty if he had the intent to kill, the prosecutor's argument all but foreclosed the jury from relying on intent to kill.

The error in the instructions was clearly exacerbated by the argument of the prosecutor. The prosecutor started his argument by advising the jurors that the charge of voluntary manslaughter did not involve the intent to kill but rather defendant sprayed bullets at apartment No. 1 with conscious disregard for life. Although the prosecutor stated the jury could consider intent to kill, the prosecutor advised the jury that the case really was based on implied malice. Later, when discussing attempted voluntary manslaughter, the prosecutor argued that defendant sprayed bullets at the apartment with conscious disregard for life but "fell short" because no one was shot and died. The prosecutor advised the jurors that defendant was not a "cold-blooded killer."

In order to find that the defendant had the intent to kill Peace, Brewer, and Thomas, the jury would have had to essentially ignore both the instructions and the prosecutor's argument, and consider on their own that defendant had the intent to kill Peace, Brewer, and Thomas. The record simply does not support that the jury struck out

19

on its own and found an intent to kill for the attempted voluntary manslaughter convictions.

The People concede that the error as to Thomas was prejudicial. Thomas was not standing by Brewer and Peace when Peace fired at defendant. He could be seen on the surveillance video hiding between two cars while the shots were being fired. Further, there was no intent to kill Thomas as evidenced by defendant and Thomas speaking immediately after the shooting; and defendant did not try to shoot Thomas despite still having the gun in his hand. We will reverse defendant's conviction of attempted voluntary manslaughter of Thomas.

As for Brewer and Peace, it was undisputed that defendant shot at them and Peace returned fire. Defense counsel argued that defendant did not have the intent to kill anyone and that he shot in self-defense because Peace shot at him first.

The People contend that defendant had to have the intent to kill because he was intending to kill Brewer and Peace in defense of himself. It would not make sense that he simply shot in their direction but did not intend to kill them. Initially, the prosecutor never argued this theory to the jury. Rather, he referred to defendant's conscious disregard for life by spraying bullets in the direction of the apartment to support both voluntary manslaughter and attempted voluntary manslaughter. Further, the People's argument is supported by reference to defendant's testimony, and that the jury in fact believed defendant's testimony that Peace shot first. In their prejudice argument, the People rely only upon defendant's testimony that he feared for his life when he shot toward the stairwell because twice previously he had been shot. However, the jury

20

rejected defendant's defense that he was fearing for his life. Moreover, Hernandez and members of the Savala family testified that the first shots were fired by defendant.

Based on the instructions, the arguments of the prosecutor ,and the jury's rejection of defendant's claim of self-defense, we cannot say with certainty that the jury based its verdict on the attempted voluntary manslaughter of Brewer and Peace on defendant's intent to kill. As such, we must also reverse counts 4 and 5.

### C. SECTION 12022.53, SUBDIVISION (B) ENHANCEMENT

Defendant contends the section 12022.53, subdivision (b), enhancement on count 6, the shooting at an inhabited dwelling within the meaning of section 246, was improperly imposed and stayed as it does not apply to a violation of section 246. The People concede the error.

Section 12022.53, subdivision (a) lists the crimes for which a section 12022.53 enhancement may be imposed. Section 246 is not included in the list and only those crimes on the list allow for the imposition of the enhancement under section 12022.53, subdivision (b). Section 12022.53, subdivision (d), on the other hand, provides, "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

The trial court imposed and stayed the section 12022.53, subdivision (b), enhancement on count 6. However, it could not be imposed on the violation of section 246. We will order that the 12022.53, subdivision (b), enhancement be stricken.

D.     SECTION 12022.53, SUBDIVISION (D) ENHANCEMENT

Defendant contends that although his trial counsel brought a motion for the trial court to dismiss the firearm enhancements found true pursuant to section 12022.53, subdivisions (b), and (d), on count 6, the trial court did not understand that the subdivision (b), enhancement was improper. As such, the trial court was not fully aware of its discretion when it denied the request to dismiss the enhancements under section 12022.53, subdivision (h), believing that both enhancements were tied together and it could not strike the section 12022.53, subdivision (d), enhancement.[4]

Prior to sentencing, defendant brought a motion to strike the gun enhancement found true pursuant to section 12022.53, subdivision (d). Defendant relied on section 12022.53, subdivision (h). Defendant contended that the prosecutor did not charge him with murder or attempted murder, but rather manslaughter. He contended it would result in a fair sentence if the enhancement was stricken.

At sentencing, the trial court stated that it had reviewed the motion. Defendant argued at the hearing that the trial court should consider that this was a voluntary manslaughter case and not murder. Further, the trial court should consider that defendant

---

[4] Defendant does not argue that the trial court could have imposed a lesser firearm enhancement.

22

had been a victim of a gang shooting prior to this incident.  Defendant believed he was in danger at the time of the shooting.  Defendant also had expressed his remorse.

The trial court ruled, "In terms of the sentencing, I'm going to do my ruling as part of the sentencing, I'm going to impose the sentences that I think are appropriate and give my reasons.  I do have discretion under the new gun enhancements, and if you look at *Romero* and the factors under *Romero*, they don't apply to this case.  There's no reason for me to strike the gun enhancements.  I think that it would be an abuse of discretion to do so.  So I decline to do that."

The trial court then heard victim statements and a statement by the defendant expressing his remorse.  The trial court considered the mitigating and aggravating circumstances; it found the circumstances in aggravation were "substantial."  The trial court imposed the section 12022.53, subdivision (d), enhancement of 25 years to life, and stayed the section 12022.53, subdivision (b), enhancement for count 6.

"The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§ 12022.53, subd (h).)  "The factors that the trial court must consider when determining whether to strike a firearm enhancement under section 12022.53, subdivision (h) are the same factors the trial court must consider when handing down a sentence in the first instance." (*People v. Pearson* (2019) 38 Cal.App.5th 112, 117.)  The court can rely on those factors listed in California Rules of Court, Rule 4.428, which include "the effect that striking the enhancement would have on the status of the

crime as a strike, the accurate reflection of the defendant's criminal conduct on his or her record, the effect it may have on the award of custody credits, and any other relevant consideration." (*Pearson*, at p. 117.)  The court may also consider the factors in California Rules of Court, Rule 4.410, listing the "general objectives in sentencing." (*Pearson*, at p. 117.)

"Where, as here, a discretionary power is . . . by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)  The burden is on the party attacking the sentence " ' " ' to clearly show that the sentencing decision was irrational or arbitrary.' " ' " (*People v. Pearson, supra,* 38 Cal.App.5th at p. 116.)

Here, defendant insists that the trial court may have considered the issue differently had it known that the section 12022.53, subdivision (b), enhancement was invalid.  The record does not support that the trial court would have decided differently. The trial court stated that it was considering all of the aggravating factors and felt that none of the gun enhancements were properly dismissed.  Remand is not necessary in order for the trial court to reconsider the issue.

Based on the foregoing, defendant was appropriately sentenced on count 6 to the upper term of 7 years, plus 25 years to life for the section 12022.53, subdivision (d), enhancement.  The section 12022.53, subdivision (b), enhancement must be stricken.

The sentence on count 1 was properly stayed and based on the finding in this opinion that counts 2, 3, 4 and 5 must be reversed, those sentences must be stricken.

## DISPOSITION

We reverse counts 2, 3, 4, and 5. We strike the sentences on counts 2, 3, 4, and 5 and the sentences on the gun enhancements for those counts. We also strike the section 12022.53, subdivision (b), enhancement. The superior court is ordered to prepare a corrected abstract of judgment reflecting the proper convictions and sentence in accordance with this opinion; the superior court is further directed to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                    J.

We concur:

RAMIREZ _____
                    P. J.

SLOUGH _____
                    J.

25